485 F.2d 768
 157 U.S.App.D.C. 397
 ASSOCIATION OF AMERICAN PUBLISHERS, INC., et al.
v.
The GOVERNORS OF the UNITED STATES POSTAL SERVICE et al., Respondents,
Direct Mail Advertising Association, Inc., et al., Intervenors.
ASSOCIATED THIRD CLASS MAIL USERS, Petitioner,
v.
The GOVERNORS OF the UNITED STATES POSTAL SERVICE, Respondent,
J. C. Penney Company, Inc., and United Parcel Service, Intervenors.
 Nos. 72-1641, 72-1726.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 6, 1972.
Decided June 26, 1973.
 
 Ian D. Volner, Washington, D. C., with whom Richard M. Schmidt, Jr., Washington, D. C., was on the brief, for petitioners in No. 72-1641. Paul Dobin, Washington, D. C., also entered an appearance for petitioners in No. 72-1641.
 J. Edward Day, with whom Lee A. Monroe, Washington, D. C., was on the brief, for petitioner in No. 72-1726.
 Stephen F. Eilperin, Atty., Dept. of Justice, for respondent. Alan S. Rosenthal, Atty. Dept. of Justice, Louis A. Cox, Marvin H. Morse and Israel Convisser, Attys. U. S. Postal Service, also entered appearances for respondents.
 
 
 1
 David E. McGiffert, Washington, D. C., was on the brief for intervenor, Direct Mail Advertising Assn. in No. 71-1641.
 
 
 2
 Robert L. Kendall, Jr. and Frederick C. Belen, were on the brief for intervenor, United Parcel Service, in No. 71-1641 and 71-1726.
 
 
 3
 David C. Todd, Washington, D. C., was on the brief for intervenor Parcel Post Assn., in No. 72-1641.
 
 
 4
 Joel P. Stern was on the brief for intervenor J. C. Penney Co., Inc., in Nos. 72-1641 and 72-1726.
 
 
 5
 Joseph H. Sharlitt and Neal E. Krucoff, Washington, D. C., entered appearances for intervenor, Mail Advertising Corp. of America, in No. 72-1641.
 
 
 6
 Before BAZELON, Chief Judge, TAMM, Circuit Judge, and WYZANSKI,* Senior United States District Judge for the District of Massachusetts.
 
 WYZANSKI, Senior District Judge:
 
 7
 In these two actions, brought on the basis of the original jurisdiction conferred on this court by Postal Reorganization Act of 1970, 39 U.S.C. Sec. 3628, Association of American Publishers, Inc., American Library Association, and National Association of College Stores, Inc., (all being petitioners in the first action, No. 72-1641) and Associated Third Class Mail Users, (petitioner in the second action, No. 72-1726) seek review of different orders of the United States Postal Service.
 
 
 8
 In both cases petitioners named as respondents the Governors of the Postal Service. In 72-1641 the United States Postal Service, an independent establishment of the Executive Branch, created by Act of August 12, 1970, 84 Stat. 720, 39 U.S.C. Sec. 201 et seq., is also named as a respondent.
 
 
 9
 Clearly the Postal Service was an appropriate respondent inasmuch as Congress provided that it could be "sued in its official name." 39 U.S.C. Sec. 401(1), as is commonly true of such administrative agencies as the Federal Reserve Board, ICC, FTC, NLRB, and SEC. Indeed it seems that action should have been brought only against it and not the Governors, who are, like Governors of the Federal Reserve Board, or members of the ICC, FTC, NLRB and SEC, not appropriate respondents when a board order is challenged on usual Constitutional, statutory, or similar grounds. The Governors of the Postal Service, unlike the former Postmasters-General, are not heads of a department which has no capacity to sue and be sued as though it were a corporate entity. But inasmuch as in these two cases the Governors have not raised this point, and the petitioners' error in pleading is one of refined technicality without substantive significance, and one which could easily be corrected, we shall treat the petitions as though they had been amended.
 
 
 10
 In the first of the two cases joined in this opinion, 72-1641, petitioners seek review of the Service's June 28, 1972 order. This court allowed United Parcel Service and J. C. Penney Co., Inc. to intervene. In this first case petitioners contend that the Service's June 28, 1972 order approving the Commission's attribution of costs and denying an increase in parcel post rates is invalid because the Commission's attribution was arbitrary and unsupported by evidence and also because the Commission refused to give independent consideration to the educational and cultural value of materials constituting special fourth class mail.
 
 
 11
 In the second of the two cases, 72-1726, different petitioners seek review of the Service's June 29, 1972 order eliminating the phasing of the increases in permanent third class mail alleged to be required by Section 3626 of the Postal Reorganization Act, 39 U.S.C. Sec. 3626, and putting in effect increased postal rates recommended by the Postal Rate Commission on June 5, 1972.
 
 
 12
 The main thrusts of the two cases are different. However, they share a common historical and statutory background.
 
 
 13
 The Postal Reorganization Act, 39 U. S.C. Sec. 101 et seq., substituted for the long-established Post Office Department the Postal Service, as an "independent establishment of the executive branch of the Government" 39 U.S.C. Sec. 201. 39 U.S.C. Sec. 3601 created the Postal Rate Commission also as an "independent establishment of the executive branch of the Government."
 
 
 14
 39 U.S.C. Sec. 3622(a) provides that if the Postal Service believes that permanent changes in postal rates are appropriate, it shall request the Commission to submit a recommended decision on rate changes.
 
 
 15
 Then 39 U.S.C. Sec. 3622(b) requires that upon receiving a request, the Commission shall make a recommended decision, taking into account certain factors, which, for the moment, we need not recite.
 
 
 16
 Pursuant to 39 U.S.C. Sec. 3625(a), "upon receiving a recommended decision from the Postal Rate Commission, the Governors may approve, allow under protest, reject, or modify that decision in accordance with the provisions of this section."
 
 
 17
 Finally, 39 U.S.C. Sec. 3628 provides for judicial review of a decision of the Governors. No doubt, what was contemplated, despite the unfortunate choice of words, was that the review is to be of an order of the Postal Service rather than of a "decision of the Governors," to which the draftsman of the statute loosely referred. Decisions in the sense of opinions are not reviewable; orders are. Governors are not, but the Service as an entity which Congress made suable is, properly charged as a respondent accountable for legal errors in or implicated in an order of the Service based upon the Governor's decision. Of course, this does not mean that if personally, or in some official capacity other than as a signatory to an order of the Postal Service, a Governor erroneously, negligently, or willfully injured some person, the Governor might not properly be named in some proceeding a defendant; though we avoid, as unnecessary for decision in this case, the prickly issue as to whether he would be suable as a respondent in this court in a proceeding brought under 39 U.S.C. Sec. 3628.
 
 
 18
 We now turn from the minor technical point with respect to the appropriate parties to these two cases to consider the merits.
 
 
 19
 In the first case, 72-1641, petitioners' challenge is to the June 28, 1972 order implementing the Governors' decision to increase the postal rates for special fourth class mail while not requiring any increase in parcel post rates.
 
 
 20
 This is the history of that order.
 
 
 21
 February 1, 1971 the United States Postal Service, in accordance with the Postal Reorganization Act of 1970, 39 U.S.C. Sec. 101 et seq., submitted to the Postal Rate Commission a request for a recommended decision authorizing increases in postal rates for all major classes and subclasses of mail, except zone rate fourth class mail.
 
 
 22
 Upon receiving the request the Commission designated a hearing officer called the Chief Examiner.
 
 
 23
 The Postal Service, in preparing for a hearing before the Chief Examiner, whose duty included taking into account the factors listed in 39 U.S.C. Sec. 3622(b), planned to present evidence showing actual costs and expenses related to postal service previously rendered. The Service in going over its records discovered that postal employees had made errors in the first half of Fiscal Year 1970 by classifying as parcel post, packages actually carried as special rate fourth class mail. To correct the impact of this error the Postal Service used the results of a two-weeks audit, made in November 1969, to shift $35.1 million of attributable costs projected for Fiscal Year 1972 from parcel post to special rate fourth class mail.
 
 
 24
 Upon submission of that evidence, the Chief Examiner rejected the use of the two-weeks audit as a correct basis for determining appropriate adjustments to the erroneous Fiscal Year 1970 figures. Instead, in order to adjust the erroneous figures, he used the results of the Service's evidence of its in-office cost system for the Fourth Postal Quarter of 1970. On that basis, he recommended that $20.6 million of attributable costs be shifted from special rate fourth class mail to parcel post. Thereupon, he reached the conclusion that the Postal Rate Commission should recommend a 4.6% increase in parcel post rates.
 
 
 25
 On review, the Commission itself concluded that there was objection to the methods used by both the Postal Service and the Chief Examiner. It averaged the results of both methods and thus made its own adjustment of attributable costs between parcel post and special rate fourth class mail. It increased the former, and reduced the latter, by $10.2 million. Then it decided that the increase in costs attributable to parcel post did not require any increase in parcel post rates. On June 28, 1972, the Governors of the Postal Service approved, and ordered put into effect, the aforesaid decision by the Commission. This is the first order appealed to this court.
 
 
 26
 Petitioners in 72-1641 attack the June 28, 1972 order on two grounds: first, that the order unlawfully approves the arbitrary and unsupported use by the Commission of estimated costs directly attributable to special fourth class mail "somewhere between" those established by the November 1969, special twoweeks audit and the Fourth Quarter figures for Fiscal Year 1970; and second, that the order unlawfully approves a Commission recommendation reflecting the Commission's erroneous refusal to give independent consideration to the educational and cultural value of materials constituting special fourth class mail, in alleged contravention of the language and legislative history of the Postal Reorganization Act of 1970.
 
 
 27
 With respect to the first point, in the language of Justice Douglas in New York v. United States, 331 U.S. 284, 328, 67 S.Ct. 1207, 1230-1231, 91 L.Ed. 1492 (1947):
 
 
 28
 We start, of course, from the premise that on a subject of transportation economics, such as this one, the Commission's judgment is entitled to great weight. The appraisal of cost figures is itself a task for experts, since these costs involve many estimates and assumptions and, unlike a problem in calculus, cannot be proved right or wrong. They are, indeed, only guides to judgment. Their weight and significance require expert appraisal.
 
 
 29
 It would, of course, be the summum bonum if we had accurate figures as to recent costs of carrying special fourth class mail. The only available figures were inaccurate, but were susceptible of rough adjustment. The Postal Service proposed one method of adjustment; the Chief Examiner, another. The Commission regarded each as helpful, but not wholly reliable. So the Commission more or less split the difference. No doubt it would have been possible to straighten out some of the errors or supposed errors of adjustment in either the Postal Service's or the Chief Examiner's calculations. And if rate-making were an exact science such a counsel of perfection would be mandatory. But, though courts hesitate so to admit, they know that in the rate-making area, John Selden was prophetic in declaring that in governing it is not juggling, but too much juggling that is to be blamed. In any case, the rough splitting of a difference between two fairly but not wholly satisfactory rate calculations is a familiar permissible technique. It is not like the situation in International Harvester v. Ruckelshaus, 155 U.S. App.D.C. 411, 478 F.2d 615, 1973, where the regulatory administrative agency rejected both the method and the results of an expert body and substituted arbitrarily its own method and prediction. That is a quite different situation from what happened here, where the regulatory administrative agency did not entirely disregard two experts, but found each somewhat in error, and took as its own solution a point somewhere between the two expert figures. When neither of two suggested adjustments applied to inaccurate data is completely satisfactory a rate-making body may fashion its own adjustments within reasonable limits. Market Street Railway Co. v. Railroad Commission, 324 U.S. 548, 560, 65 S.Ct. 770, 89 L.Ed. 1171 (1945); Permian Basin Area Rate Cases, 390 U.S. 747, 800, 817-818, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Since Solomon's day, to split the difference or to come close thereto has been thought wise, if only because it makes parties more likely to disclose to tribunals the truth.
 
 
 30
 The second point, which in their brief and undoubtedly in their clients' views comes first, is the contention of petitioners in 72-1641 that the Commission's refusal to give independent consideration to the educational and cultural value of materials constituting special fourth class mail contravenes the language and legislative history of the Postal Reorganization Act of 1970 and therefore is an abuse of its authority.
 
 
 31
 Obviously this is not a contention that the rates are discriminatory. The claim is that in reaching a rate result, the Commission failed to apply if not the precise language, at least the fair intendment, of the policy declared by and the criteria set forth in the United States Postal Service Act; Act of Aug. 12, 1970, 84 Stat. 719, 39 U.S.C. Sec. 101 et seq. Reliance is placed particularly on parts of the Declaration of Postal Policy in Section 101 of the Act, 84 Stat. 719, 39 U.S.C. Sec. 101 and what may for convenience be called "the factor sheet," that is the criteria listed, in Section 3622(b) of the Act, 84 Stat. 760, 39 U. S.C. Sec. 3622(b).
 
 
 32
 Section 101 sets forth as one of many postal policies that "the Postal Service shall have as its basic function the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people."
 
 
 33
 Section 3622(b) directs that in changing the rate schedule the Commission shall proceed in accordance with the policies set forth in Section 101 of the Act and with the following factors:
 
 
 34
 "(1) the establishment and maintenance of a fair and equitable schedule;
 
 
 35
 (2) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;
 
 
 36
 (3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;
 
 
 37
 (4) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;
 
 
 38
 (5) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;
 
 
 39
 (6) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;
 
 
 40
 (7) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged with various classes of mail for postal services; and
 
 
 41
 (8) such other factors as the Commission deems appropriate."
 
 
 42
 Like most other factors sheets, whether in statutes, A.L.I. Restatements, or comparable compilations, the factors listed are not analogous to a table of atomic weights, or to the multiplication table. The factors are reminders of relevant considerations, not counters to be placed on scales or weight-watching machines.
 
 
 43
 No one who seeks fairly and equitably to determine a complicated rate structure ought to suppose that there is a correct answer, or even that in the final mix there should have been added a specified number of spoonfuls of each of the ingredients. A conscientious, competent rate-making body proceeds by opening its mind to relevant considerations, and closing its ears to irrelevant ones. It is governed by policies not politics.
 
 
 44
 A reviewing court under familiar jurisdictional principles may not, and under human limitations generally could not, reassess the weights given by a rate-making agency to different factors, absent a legislative direction as to precisely what gravity each factor bears. All that the court may properly do is to consider whether the agency did take into account all the relevant factors and no others.
 
 
 45
 Here the administrative record has abundant indication that the Commission and the Governors heard the relevant and excluded the irrelevant testimony, and made their appraisals with a correct understanding of the Congressional mandate. There is nothing to petitioners' argument that the Postal Service misunderstood the meaning of Factor 2-"the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to, the collection, mode of transportation, and priority of delivery." What "value," as there used, means is the economic concept of "value-of-service," an approach which looks to demand factors, "what the traffic will bear." Payne v. Washington Metropolitan Area Transit Com'n., 134 U.S.App.D.C. 321, 415 F.2d 901, 916 (1968). See J. C. Bonbright Principles of Public Utility Rates (1961), p. 287. It is not possible to regulate rates with any pretense of objectivity if, as petitioners urge, one were to consider educational and cultural value. In those humanistic domains values tend, as Wittgenstein and Valery constantly reminded us, to be almost wholly emotional.
 
 
 46
 Indeed the Commission went as far as it appropriately could when it announced that in weighing the economic impact of postal rate increases, the Commission will be especially alert to guard against the impairment of mail services which make informational, cultural and educational contributions to society." Nor did the Commission keep the word of promise to the ear, and break it to the hope. The Commission and the Governors prescribed for special fourth class mail rates of fourteen and seven cents at present; twenty-one cents and ten cents after five years. The differential between special fourth class mail rates and other rates was, if anything, narrowed to favor the former. We do not stop to set forth the figures, inasmuch as there is not, and could not plausibly be, any claim of adverse discrimination. The rate structure is, if anything, slanted favorably to petitioners.
 
 
 47
 If petitioners are aggrieved by asserted insensitivity to the unquestionably major contributions made to our civilization by the type of mail matter for which they are spokesmen, the remedy is legislative. The very books which petitioners and the court cherish instruct us that the judicial role is, and in a Constitutional democracy should be, limited. Ours is only to determine whether the Postal Service lacked substantial evidence for rates it prescribed, took into account irrelevant considerations, omitted relevant considerations, flouted a statutory command, acted ultra vires, or denied a Constitutional right. Nothing of those types of error is proved here. Petitioners' complaint is essentially political, not legal. Likewise, the remedy is political, not legal.
 
 
 48
 In sum, we decline to set aside the Postal Service's June 28, 1972 order.
 
 
 49
 We turn to 72-1726 to consider the validity of that part of the Postal Service's June 29, 1972 order which followed the Commission's recommendation with respect to third class mail rates.
 
 
 50
 Section 3626 of the Postal Reorganization Act, 39 U.S.C. Sec. 3626, provides for third class mail rates which are to be at a high level immediately unless there is what is called by the parties here "the phasing of increases in permanent third-class mail rates." Petitioners in 72-1726 claim that the part of the June 29, 1972 order to which they object by putting the high rates into effect immediately, unlawfully eliminates the phasing of increases.
 
 
 51
 It is undeniable that the June 29 order puts into effect the Section 3626 increases without gradually "phasing" them. But the reason the Governors, like the Commission, gave for ignoring the "phasing" and making the increase immediate in its total impact was that this is what Congress directed should be the result in a situation where Congress had failed to appropriate funds within the meaning of Section 3627 of the Act, 39 U.S.C. Sec. 3627, which provides:
 
 
 52
 "If Congress fails to appropriate an amount authorized under section 2401(c) of this title for any class of mail sent at a free or reduced rate under section 3217, 3403-3405, or 3626 of this title, or under the Federal Voting Assistance Act of 1955, the rate for that class may be adjusted in accordance with the provisions of this subchapter so that the increased revenues received from the users of such class will equal the amount for that class that the Congress was to appropriate."
 
 
 53
 What the dispute between the parties in 72-1726 turns on is the legal question whether the governors could properly have concluded that Congress had failed to appropriate for the Fiscal Year 1973 for third class regular mail so-called "revenue foregone" funds, i. e., the sum which the Postal Service had determined it would lose because of a rate preference which had been, by the phasing provisions of 39 U.S.C. Sec. 3626, conditionally allowed to third class mail.
 
 
 54
 There is no factual dispute. The Service asked Congress to appropriate for the Postal Service $1,640.4 million, of which $687.9 million was requested for revenue foregone. The Office of Management and Budget, on behalf of the President, submitted to Congress a total Postal Service Appropriation of $1,424.039 million, of which $471.5 million was for revenue foregone. The Director of OMB wrote to the Postmaster-General a letter, transmitted to Congress, explaining that the President's request did not include $216 million of revenue foregone funds necessary for phasing third class regular rate and controlled circulation mail. The Postal Service informed Congress that if it failed to restore the $216 million the Postal Service would treat that failure as a failure of revenue foregone for the purpose of applying 39 U.S.C. Secs. 3626 and 3627. Congress did not vote the funds requested by Postal Service, and even cut the Budget's figures by $14.039 million, and made a lump sum appropriation of $1,410 million for the Postal Service.
 
 
 55
 While petitioners with subtlety and skill weave an argument for their position that Congress did not fail to appropriate the amount required to meet the statutory condition which was precedent to the phasing of the increase in postal rates for third class matter, we are more amazed at its ingenuity than persuaded by its soundness. It seems to us quite plain that if in good faith (which no one denies) the Postal Service specifies how many dollars it must get from Congress in order not to be in the hole with respect to carrying third class mail, then, regardless of Budget officials or others outside the Postal Service, the Postal Service's conclusion fixes the amount of revenue foregone in so far as that concept is used in 39 U.S.C. Secs. 3626 and 3627 or other parts of the Postal Service Act.
 
 
 56
 We conclude that the petition to set aside so much of the June 29, 1972 order as is attacked in 72-1726 must be denied and dismissed.
 
 
 57
 Petitions in both 72-1641 and 72-1726 dismissed.
 
 
 58
 BAZELON, Chief Judge, concurring with whom Circuit Judge TAMM and Senior District Judge WYZANSKI join:
 
 
 59
 The Postal Reorganization Act of 1970 resulted from Congress' determination to remove the Post Office Department from the political arena, and to provide for a system of administrative controls that would guarantee efficient, economical, and equitable operation of the nation's mails.[1] This case shows that the Postal Service has some distance to go if it is to reach that goal in fixing rates. My vote to affirm is based, first, on my belief that this lack of progress may be properly laid to the novelty of the undertaking,[2] and, second, on the record's assurances that the Postal Rate Commission is making a sincere effort to regularize the Postal Service's procedures and accounting principles.[3]
 
 
 60
 One troubling aspect of the Postal Service's approach in this case requires comment. The Act directs that the Postal Rate Commission determine rates in accordance with certain guidelines.[4] The most concrete of these, section 3622(b) (3), establishes the requirement that each class of mail or type of mail service bear (1) the direct and indirect postal costs attributable to that class or type plus (2) that portion of all other costs of the Postal Service reasonably assignable to such class or type.[5]
 
 
 61
 The Postal Service's response to this requirement was questionable at best. It proposed that the Commission "attribute" only 49 percent of the ten billion dollars at issue.[6] The remainder, it said, should be "reasonably assigned." It presented a schedule of such assignments that, it said, had been derived by two of its employees through the use of a formula. The formula, in turn, was purportedly composed of three factors: (1) the hypothesized elasticity of demand for each class of mail; (2) the "value" of each class; and (3) the competitive stance of the Postal Service in those cases in which it lacked a legal monopoly.[7] And when application of this vague formula threatened to result in great changes from pre-existing rates, it was simply suspended and an alternative substituted.[8] The Chief Examiner aptly concluded:
 
 
 62
 Distributing billions of dollars on the basis of thinly supported judgments is not an acceptable method. And it is an invitation to pressures which Congress sought to avoid.[9]
 
 
 63
 The defects in Postal Service's proposals were not confined to the scheme it applied. The Chief Examiner stated in his opinion that, as to the entire proposal, he had been unable to satisfactorily reconstruct the derivation of these supposedly "reasonable" cost assignments.[10] Although he explicitly noted that the two staff members had been forthright witnesses, the Chief Examiner was stern in his criticism of this loose approach to development of rate proposals. Nevertheless, he held that they were adequately justified in view of the circumstances, and he contented himself with a recommendation that the assignment of costs on a "reasonable" basis be reduced in future proposals by a more diligent effort to link long-term and indirect costs to the classes of service that gave rise to them.[11]
 
 
 64
 The Postal Rate Commission disagreed with the harshness of the Chief Examiner's criticism, but its more tolerant view did not extend to the fundamental problem: an unstructured and well-nigh unreviewable discretion in two individuals to propose allocation of over half the Service's budget. Instead, the Commission pointed to the pragmatic difficulties that faced the staff: a novel proceeding, a lack of reliable data, and a limited amount of time. But the Commission concluded with an admission of the accuracy of the Chief Examiner's criticisms by stating that the Postal Rate Commission would itself undertake a rulemaking proceeding to deal with Postal Service's deficient accounting and cost assignment techniques.[12]
 
 
 65
 The rates are not set by Postal Service staff, of course, but by the Postal Rate Commission, subject to review by the Board of Governors.[13] Nevertheless, the Chief Examiner rightly noted that Postal Service staff is in a unique position. It alone takes in the full scope of Postal Service operations when presenting its proposals. And it alone is in a position to influence the Postal Service's day-to-day accounting procedures and record keeping. Outsider challenges to the fundamental approach Postal Service takes to ratemaking are unlikely to meet with stunning success under these circumstances.[14] Yet when this case arose, neither the portion of the Service's budget subject to "reasonable" allocation, nor the procedures through which the Service prepares its proposals concerning discretionary allocations, were spelled out in statutes or rules.
 
 
 66
 Section 3622(b) (3) is susceptible of a variety of interpretations, as all parties to this proceeding have recognized.[15] But it is important to note as well that Postal Service's power to propose rates to the Commission was conferred by Congress in the same Act.[16] It would certainly be reasonable to assume that Congress meant the Postal Service to structure its own process for preparing such proposals so that there would be at least a rough correspondence between the amount of money it would discretionarily allocate and the care with which it prepared and supported those proposals.
 
 
 67
 Indeed, Congress may have meant to go further. Its stated intent to purge the postal system of "politics" provides a strong indication that the Chief Examiner was correct when he suggested that discretionary or "reasonable" assignment of costs should apply only where Postal Service simply could not "attribute" costs.[17] Under that view, Postal Service could not rectify its errors in this proceeding by merely providing for a more careful "allocation" of the five billion dollars at stake. It would be required to itemize its costs in more detail, determine which classes of service caused them, and attribute those costs solely on that basis. Only very long-term costs and overhead could be "reasonably assigned."
 
 
 68
 That question need not be resolved in this case, for the presumptions that surround an initial effort to formulate rates are sufficient to justify the approximations that Postal Service supplied to the Postal Rate Commission here. But, when the Postal Rate Commission establishes guidelines for future rate proposals, it may wish to take a hard look at both the manner in which Postal Service assigns unattributable costs and the amount of costs that it designates "unattributable."[18]
 
 
 
 *
 Sitting by designation pursuant to Title 28, U.S.C. Sec. 294(d)
 
 
 [1]
 See S.Rep.No.91-912, 91st Cong., 2d Sess. 11 (1970), U.S.Code Cong. & Admin.News 1970, p. 3649
 Indeed, Congress defined "politics" for the benefit of the regulatory authorities:
 [I]f postal rates and postal classification are going to be established on a basis of charging whatever the traffic will bear to a particular class of mail according to its ability to pay, or what kind of an increase it got last time, or its 'social acceptability,' then Congress is clearly better qualified to make such judgments than the Postal Service or any expert commission. Such purely political judgments are the province of Congress.
 Id. Although the Chief Examiner took this admonition to heart, the opinion of the Postal Rate Commission itself manifests a disturbing disregard of Congress intention, including the instruction elsewhere in the Senate Report that rates are to be established "on the basis of expert consideration of the overall value of the service provided and the allocation of costs on a scientific or quasi-scientific basis." Id.
 For example, in making some adjustments to the Chief Examiner's recommendations regarding second-class mail, the Commission said:
 The Commission's recommended rates are designed to meet the statutory requirement to balance costs and revenues. In those instances where our decision reduces the Service's proposed rates, it is the result of our judgment that the need to establish equitable rates must be balanced with our responsibility to correct existing rate design inequities.
 Postal Rate Commission Opinion, Appendix at 1-267.
 
 
 [2]
 See Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)
 I do not, by the reference, mean to imply that future judicial review will take the course followed by later Natural Gas Act cases. See Southern Louisiana Area Rate Cases II, 483 F.2d 880 (5th Cir., 1973).
 
 
 [3]
 The Commission concluded the first part of its opinion with the statement:
 In determining thees rates the Commission has accepted the Postal Service's costing presentation as being appropriate for the present proceeding. However, the Commission intends to institute a rulemaking proceeding for the purpose, among other things, of determining what cost and revenue data should be obtained for use in future proceedings.
 
 
 [4]
 39 U.S.C. Sec. 3622(b). Technically, the Postal Rate Commission merely renders a "recommended decision." But, as the Board of Governors observed in its opinion in this case, the power of the Board to revise that opinion is extremely narrow. See 39 U.S.C. Sec. 3625 (1970)
 
 
 [5]
 39 U.S.C. Sec. 3622(b) (3) (1970) (emphasis and numbering added)
 
 
 [6]
 The Chief Examiner reported that Postal Service's proposal "attributed" approximately $4.78 billion, and judgmentally distributed $5.06 billion. He observed that this action had 3 primary consequences:
 
 
 [1]
 The costs for classes of mail do not reflect the full cost burden they impose on the system
 
 
 [2]
 By not taking present account of predictable long-run cost variability, the method is increasing future cost and rate instability
 
 
 [3]
 By restricting the category of attributable costs, the method enlarges the amount of institutional costs which are distributed to the classes of mail on the basis of Postal Service's judgmental evaluation of pricing factors instead of on a cost basis
 He could have added that this action makes review of such "judgmental evaluations" rather difficult.
 
 
 [7]
 The Chief Examiner pointed out, inter alia,
 No study presented [in evidence] shows that the demand of any class of mail is elastic. It is difficult to estimate what will happen if rates for a class are raised far beyond existing levels because there is no data on the subject.
 And, later in the opinion,
 In this proceeding Postal Service is proposing to use relative elasticity of demand as a major factor in allocating billions of dollars in institutional costs to the various classes[54] of mail. . . . Not only are the measurements of demand presently too cloudy and unreliable for this purpose, but the economics of Postal Service are such that using this method will probably result in discrimination without justification or benefit.
 
 
 [54]
 Postal Service tries to avoid this word but that is what it is doing
 
 
 [8]
 For example, the Postal Service did not use elasticity of demand in setting rates for first class mail. It argued that the fact that it has a monopoly over this class, and the fact that the class has an extremely low elasticity of demand, "would lead to first class being assigned a heavier proportion of institutional costs than any other class." Chief Examiner's Opinion, Appendix at 1-11. Accordingly, it simply substituted the supposed elasticity of demand for the highest of the other classes. Id
 Despite this adjustment, however, the Chief Examiner found that Postal Service's distribution of institutional costs "favor second and third-class to the detriment of first-class." Id. at 1-16.
 
 
 [9]
 Id. at 1-17. Providing specific cases in which theory failed to appear in practice, the Chief Examiner examined the factor "value of the mail to the recipient" and reported:
 Here, Postal Service becomes involved in social considerations and subjective evaluations which are difficult to apply. For example, Postal Service finds that the contents of second-class mail have a high value because of their "cultural, educational and informations values", which justify a low price. . . . But as has been noted Postal Service deems the contents of first-class to have a high value which warrants a high price.
 Id. at 1-14.
 
 
 [10]
 [B]ecause the process is largely subjective, it is impossible to determine which factors-or the extent to which various factors-guided Postal Service in its distribution of institutional costs. As a consequence, one cannot replicate Postal Service's methods to test their procedures, weightings, or merits
 Id. at 1-16.
 
 
 [11]
 Id. at 1-17
 
 
 [12]
 See note 3 supra
 
 
 [13]
 See note 4 supra
 
 
 [14]
 Indeed, the Chief Examiner himself felt sufficiently constrained that he began his rate recommendations with the statement:
 Only the minimum necessary changes will be adopted in the specific rates proposed by Postal Service because the record in this case does not permit the determination of rates on what should be the proper basis.
 Chief Examiner's Opinion, Appendix at 1-17.
 
 
 [15]
 Id. at 1-7; Postal Rate Commission Opinion, Appendix at 1-276-80
 
 
 [16]
 See 39 U.S.C. Sec. 3622(a) (1970)
 
 
 [17]
 More precisely, he quoted section 3622 (b) (3) and stated "The paragraph as a whole suggests that assignment of costs was to be carried out as far as it reasonably could be." Chief Examiner's Opinion, Appendix at 1-9 (emphasis added)
 
 
 [18]
 The Commission would be well advised in this undertaking to begin with the excellent opinion of Chief Examiner Seymour Wenner. See note 1 supra