**DIRECT MAIL/MARKETING ASSOCIATION, INC., Appellant,**

v.

**UNITED STATES POSTAL SERVICE.**

No. 74–1272.

United States Court of Appeals, District of Columbia Circuit.

Argued June 6, 1974.

Decided June 28, 1974.

David E. McGiffert, Washington, D. C., for appellant. Dana T. Ackerly, New Canaan, Conn., also entered an appearance for appellant.

Stephen F. Eilperin, Atty., Dept of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Michael H. Stein, Atty., Dept. of Justice, were on the brief, for appellee.

Before WRIGHT and WILKEY, Circuit Judges, and JAMESON,* Senior District Judge.

J. SKELLY WRIGHT, Circuit Judge:

Direct Mail/Marketing Association, Inc. (DMMA), plaintiff-appellant, sought in the District Court a declaration[1] that a schedule of temporary mail rates implemented by the United States Postal Service violated Section 403(c) of the Postal Reorganization Act of 1970,[2] 39 U.S.C. § 403(c) (1970), by working an "undue or unrea-

sonable discrimination" against users of regular third class mail service. The District Court dismissed the complaint for failure to state a claim but, apparently, also reached the merits to the extent of holding "that there is no undue or unreasonable discrimination within the meaning of 39 U.S.C. 403(c) in the schedule of temporary rates * * *."[3] Because a schedule of temporary rates must meet the standard of Section 403(c),[4] the complaint did state a cause of action. However, we affirm the holding on the merits that this schedule worked no unlawful discrimination.

I

This court has already canvassed the complex procedures by which postal rates are set under the Act. *See* Assn of American Publishers, Inc. v. Governors of U.S. Postal Service, 157 U.S. App.D.C. 397, 485 F.2d 768 (1973); Direct Mail Advertising Assn v. U.S. Postal Service, 147 U.S.App.D.C. 394, 458 F. 2d 813 (1972). *See also* Mail Advertising Corp. of America v. United States Postal Service, 148 U.S.App.D.C. 158, 459 F.2d 1182 (1972), which upheld the constitutionality of the procedures. In brief: The Postal Service initiates the process by requesting permanent rate changes, which request is adjudicated before the independent Postal Rate Commission.[5] The Commission's decision is subject to review by the Governors of the Postal Service,[6] and ultimately by the courts.[7] For certain classes of mail, including third class mail, rate increases approved by the Governors must be introduced in gradual year-by-year steps if Congress appropriates money to cover the revenue fore-

---

* Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

1. An injunction was also sought, but the District Court's denial of that relief has not been appealed.

2. 39 U.S.C. § 101 *et seq.* (1970), Pub.L. 91–375, Aug. 12, 1970, 84 Stat. 719.

3. Order of Feb. 21, 1974, Civil Action No. 74–254.

4. The section applies to provision of all "services" and establishment of all "classifications, rates, and fees under this title."

5. 39 U.S.C. §§ 3622, 3624.

6. 39 U.S.C. §§ 3621, 3625.

7. 39 U.S.C. § 3628.

gone by such "phasing." [8] If Congress does not appropriate this revenue foregone, the rate increases may be implemented instanter, without phasing.[9]

The Postal Service may, however, implement "temporary" rate increases before this elaborate procedure has run its course. Specifically, if the Commission fails to issue its decision within 90 days of the Postal Service's request for an increase in permanent rates, the Service may, upon 10 days notice in the Federal Register, "place into effect temporary changes in rates of postage, [and] in fees for postal service * * * it considers appropriate to carry out the provisions" of the Act. 39 U.S.C. § 3641(a). The Service does not have *carte blanche* in setting temporary rates. A temporary rate

> may not exceed the lesser of (1) the rate or fee requested for such class or service, or (2) a rate or fee which is more than one-third greater than the permanent rate or fee in effect for that class or service at the time a permanent change in the rate or fee of such class or service is requested under section 3622 of this title.

39 U.S.C. § 3641(c). The "rate or fee requested"—the ceiling on temporary rates set in Section 3641(c)(1)—refers to the full permanent rate requested, not to the "phased" level of that permanent rate. Thus Section 3641(c) does not embody the mandatory phasing requirement, which applies in terms only to permanent rates. Direct Mail Advertising Assn v. United States Postal Service, *supra*. In addition to the "ceiling" requirement in Section 3641(c), the Act requires that temporary rates, like permanent ones, bear a reasonable relationship *inter sese*:

> In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.

39 U.S.C. § 403(c).

The present case involves a schedule of temporary rates allegedly in violation of the nondiscrimination requirement in Section 403(c). The necessary background is quickly recited. The Postal Service gave notice on October 19, 1973 that it had requested an increase in permanent rates and that it would implement temporary rate increases on January 5, 1974 if the Commission had not acted on the request within 90 days.[10] On December 21, 1973 the Service gave notice that, for the third class regular mail, the temporary rate would equal the requested permanent rate, but that all other classes of mail eligible for "phasing" would enjoy temporary rates at the "phased" (*i. e.* first step) level of the corresponding permanent rates requested.[11] The Service made this distinction on the theory that Congress would pass supplemental appropriations to support phasing of all temporary rates except that for third class mail.

Because of action by the Cost of Living Council, the temporary rates were implemented on March 2, 1974, rather than January 5, 1974, but they otherwise conformed to the prior announcement.[12] In the meantime, the Service had in fact sought a supplemental appropriation to support phasing of the temporary rates—including phasing of temporary third class rates. The Service asked for a total of $195 million —$84 million to support phasing of third class rates and $111 million to support phasing of other phasing-eligible rates.[13] The President joined the request for $111 million but advocated

---

8. 39 U.S.C. § 3626.

9. 39 U.S.C. § 3627.

10. 38 Fed.Reg. 29198.

11. 38 Fed.Reg. 35056.

12. *See* 39 Fed.Reg. 1125 (Jan. 4, 1974).

13. *See* Hearings, Subcommittee of the House Committee on Appropriations, on Fiscal Year 1974 Supplemental Appropriation, 93d Cong., 1st Sess., 1084–1085, 1101–1102

omitting any appropriation to support phasing of third class rates.[14] The House passed a $110 million appropriation, the Senate a $100 million appropriation,[15] and the Conference Committee settled upon a $105 million figure, the legislation stating in its entirety:

> For an additional amount for "Payment to the postal service fund", $105,000,000.

Pub.L. 93–245, 93d Cong., 1st Sess., 12 (January 3, 1974).

## II

The question before us is whether the discrepancy between third class and other "phasing-eligible" rates, alleged to be discriminatory under 39 U.S.C. § 403(c), can be justified by Congress' action in passing the $105 million supplemental appropriation. DMMA argues in the negative on two grounds: (1) that appropriations actions are irrelevant to assessing the legality of temporary rates, and (2) that, if the appropriations action is relevant, it nonetheless reflects congressional intent too ambiguously in this case to support the inter-rate discrepancy. We reject both arguments.

The first argument rests upon Direct Mail Advertising Assn v. United States Postal Service, *supra*. There, as here, the Postal Service had established a temporary rate schedule in which third class mail charges were at the full permanent rate requested, rather than at the first "phasing" step of that rate. The District Court had ruled that all phasing-eligible rates must be phased, unless Congress fails to appropriate the necessary revenues, and that Congress had not failed to do so. On appeal by the Postal Service we held that phasing was not required for temporary rates

but only for permanent rates. We reasoned that the phasing provisions are located in the subchapter on permanent rates, not the one on temporary rates, that the provisions take effect only after the first permanent rate decision (which had not then occurred), that recourse to congressional appropriations to support phasing of temporary rates would be cumbersome as a practical matter, and, finally, that the Act contains "ceiling" limitations peculiar to temporary rates, 39 U.S.C. § 3641(c), which supplant the lower ceilings represented by "phasing." 147 U.S.App.D.C. at 397–399, 458 F.2d at 816–818. As the temporary rate in question met the requirements of Section 3641(c), we sustained the Postal Service; we found it unnecessary to consider whether Congress had in fact failed to appropriate money to support phasing of that rate, "[s]ince we have concluded that, in any case, phasing is not required by the Act for temporary rates." 147 U.S.App.D.C. at 397 n. 9, 458 F.2d at 816 n. 9.

DMMA reads Direct Mail Advertising Assn broadly as holding that the phasing provisions have no application to temporary rates. If this were true, the temporary rate structure at issue in the present case would lack the coherent rationale required by the nondiscrimination provision, 39 U.S.C. § 403(c). The rate structure distinguishes between rates eligible and ineligible for phasing, and it distinguishes between third class and other phasing-eligible rates by relying on congressional appropriations action, as specified in the Act's phasing provisions. If those provisions have no application to temporary rates, none of these distinctions makes sense.

But *Direct Mail Advertising Assn* cannot in fact be accorded a broad

---

(1973) (hereinafter House Hearings); Hearings, Senate Committee on Appropriations, on 1974 Supplemental Appropriation, 93d Cong., 2d Sess., Part I, 378 (1973).

14. The exact amount requested by the President, via the Office of Management and Budget, was $111,603,000. *See* H.R.Doc. No.93–178, 93d Cong., 2d Sess. (1973), *and*

House Hearings, *supra* note 13, at 1084 & 1101.

15. The bills passed conformed to the pertinent committee recommendations. *See* H.R. Rep.No.93–663, 93d Cong., 1st Sess., 40 (1973), *and* S.Rep.No.93–614, 93d Cong., 1st Sess., 66 (1973).

reading. As this court subsequently stated, in denying a motion to rehear that case, *Direct Mail Advertising Assn* was decided without considering the possible bearing of Section 403(c) on the question of whether the phasing provisions apply to schedules of temporary rates.[16] This unresolved issue is before us now. Our conclusions are quite simple and straightforward. We agree with the earlier court that the Act does not *require* phasing of temporary rates. Consistent with Section 3641(c)(1), the Postal Service may set temporary rates equal to the corresponding permanent rates requested. When this is done *throughout* a schedule of temporary rates, there will presumably be no shortfall between temporary revenue collected and temporary revenue needed and, consequently, no occasion to petition Congress for supporting appropriations. But Section 3641(c)(1) establishes only a *ceiling* on temporary rates, not a floor. Thus it is open to the Service to introduce temporary rates some or all of which are at their phased levels. As a practical matter, this course will require supporting appropriations.[17] When the Service chooses in this way to phase some or all of its temporary rates, and to seek appropriations as support, the phasing provisions, 39 U.S.C. §§ 2401 (c), 3626, and 3627, come into play.[18]

The Service's choice vests in the Congress the power to determine, through the appropriations process, which temporary rates shall be phased and which shall not.[19]

This reading of the Act has a direct bearing on the nondiscrimination provision, 39 U.S.C. § 403(c). That provision recognizes as legal any inter-rate discrepancy which is "specifically authorized in this title." Obviously, any inter-rate discrepancies resulting from a proper invocation of the phasing provisions would be "specifically authorized in this title." Therefore, the sole question before us is whether the discrepancy between third class and other phasing-eligible rates contained in the present schedule of temporary rates results from proper application of the phasing procedures. That is, we must determine whether Congress' appropriations action evinced an intent to ratify the inter-rate discrepancy pursuant to 39 U.S.C. § 3627.

DMMA insists that Congress' action was ambiguous on this point. There is some merit in the argument. The supplemental appropriation came in a lump sum, with no explicit assignment of particular amounts to particular classes of mail.[20] By so obscuring its will, Congress causes a great waste of

16. The petition for rehearing stressed that phasing of temporary rates would raise serious problems under § 403(c) if the phasing provisions were in fact inapplicable to temporary rates, as the court had implied. In denying rehearing the court clarified its opinion as follows:

The Court has considered the petition for rehearing or recall of the mandate, and the opposition thereto. We decline to order rehearing, but a clarification of our original opinion is in order. The allegation that the temporary rates for third class mail instituted by the Postal Service were discriminatory in violation of 39 U. S.C. § 403 (1970) was not in issue when we first heard this case. It was therefore neither considered nor disposed of by the original opinion.

Direct Mail Advertising Assn v. United States Postal Service, D.C.Cir., No. 72–1065, order of March 15, 1972 (unreported).

17. The Postal Service has assured us that the practical difficulties earlier perceived in utilizing the appropriations process to ratify temporary rate schedules have considerably diminished. *Compare* Direct Mail Advertising Assn v. United States Postal Service, 147 U.S.App.D.C. 394, 399, 458 F.2d 813, 818 (1972).

18. The phasing provisions take effect only after the first permanent rate decision has been rendered under the Act. 39 U.S.C. § 3626. That event has now occurred, but had not done so at the time *Direct Mail Advertising Assn* was written.

19. That is, Congress may either compel or veto phasing of any and all eligible temporary rates, contrary to the wishes of the Postal Service, once the Service makes the threshold choice to seek appropriations as support for a temporary rate schedule.

20. In addition, the amount appropriated is not precisely equal to the amount necessary

administrative and judicial energies. Nevertheless, the congressional intent here is not beyond discernment. For reading congressional intent we have fashioned a very lenient standard:

> It seems to us quite plain that if in good faith (which no one denies) the Postal Service specifies how many dollars it must get from Congress in order not to be in the hole with respect to carrying third class mail, then, regardless of Budget officials or others outside the Postal Service, the Postal Service's conclusion fixes the amount of revenue foregone in so far as that concept is used in 39 U.S.C. §§ 3626 and 3627 or other parts of the Postal Service Act.

Assn of American Publishers, Inc. v. Governors of United States Postal Service, *supra*, 157 U.S.App.D.C. at 405, 485 F.2d at 776. The Postal Service did make a good faith request for $84 million to support phasing third class mail. By so doing the Service acquired the power to interpret Congress' response to that request, subject only to judicial review for arbitrariness or caprice. The House and the Senate separately, and the Conference Committee which resolved their differences, all embraced appropriations levels below that requested by the President, whose recommendation expressly excluded money for phasing third class mail. Though the House committee was silent on the issue, the Senate committee expressly noted that its recommended bill excluded any revenue for phasing third class mail rates.[21] With this background, the Postal Service's interpretation of Congress' will was manifestly reasonable.

Accordingly, we find that the discrepancy between third class and other phasing-eligible rates was properly determined according to the phasing provisions of the Act and, being "specifically authorized" in this fashion, was not in violation of 39 U.S.C. § 403(c).

Affirmed.

---

to phase all eligible rates other than the third class rate. This is of course a factor to be weighed in interpreting the purport of Congress' action, but it is not necessarily a dispositive factor.

21. S.Rep.No.93–614, *supra* note 15, at 66.