**STATE OF MAINE et al.,**
**Plaintiffs,**

v.

**UNITED STATES POSTAL SERVICE,**
**Defendant.**

**Civ. A. No. 75–1782.**

United States District Court,
District of Columbia.

Dec. 16, 1975.

Donald G. Alexander, Asst. Atty., Dept. of the Atty. Gen., Augusta, Me., for State of Maine.

James R. Adams, Asst. Atty. Gen., Dept. of the Atty. Gen., Boston, Mass., for Commonwealth of Massachusetts.

Kendall L. Vick, Asst. Atty. Gen., Dept. of Justice, New Orleans, La., for State of Louisiana.

Gerald J. Dowling, Asst. Atty. Gen., Dept. of the Atty. Gen., Hartford, Conn., for State of Connecticut.

Benson D. Scotch, Asst. Atty. Gen., Dept. of the Atty. Gen., Montpelier, Vt., for State of Vermont.

James B. McCabe, Seattle, Wash., William R. Scanlin, Washington, D. C., for State of Washington.

James B. McCabe, Seattle, Wash., for the States of Arkansas, Illinois, Iowa, North Dakota and Oklahoma.

Gregory L. Benik, Special Asst. Atty. Gen., Providence, R. I., for State of Rhode Island, intervening plaintiff.

Eugene F. McShane, Asst. Atty. Gen., Special Litigation Section, Columbus, Ohio for State of Ohio, intervening plaintiff.

James D. Whisenand, Asst. Atty. Gen., Tallahassee, Fla., for State of Florida, intervening plaintiff.

Donald P. Bogard, Asst. Atty. Gen., Indianapolis, Ind., for State of Indiana, intervening plaintiff.

William C. Bednar, Jr., Asst. Atty. Gen., Austin, Tex., for State of Texas, intervening plaintiff.

John William Calhoun, Asst. Atty. Gen., Madison, Wis., for State of Wisconsin, Intervening Plaintiff.

Paul M. Tschirhart, Asst. U. S. Atty., Washington, D. C., Eugene R. Sullivan, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION

HART, District Judge.

The plaintiffs, seventeen States and Commonwealths of the Union suing in their own right and as *parens patriae* on behalf of their citizens, have moved for a preliminary injunction against the imposition by the defendant United States Postal Service of a temporary increase in first-class postal rates pursuant to 39 U.S.C. § 3641 (1970). Plaintiffs allege that the proposed temporary rates impose an undue burden upon first-class mail users, resulting in discrimination and cross-subsidization among classes of mail and maintain that this is illegal under standards established by the courts and by the Postal Reorganization Act, Pub.L.No. 91–375, 84 Stat. 719 (1970), codified at 39 U.S.C. § 101 *et seq.* (1970) (the "Act"). The proposed rate increases, unless enjoined, will commence December 28, 1975 and continue at least until June of 1976.

### I

Plaintiffs' case challenging temporary rates under 39 U.S.C. § 3641 (1970) arises in a different statutory context than review of permanent postal ratemaking. Permanent ratemaking is accomplished by a complex administrative process involving, first, the filing of a request by the Postal Service for rate increases with the independent Postal Rate Commission; second, hearings by the Commission resulting in its recommended decision; third, approval, rejection or modification of that decision by the Governors of the Postal Service; and fourth, exclusive judicial review of action by the Governors in the United States Courts of Appeals by any party to the hearings. 39 U.S.C. §§ 3621–22, 3624–25, 3628 (1970). Temporary rate increases, on the other hand, may be im-

posed unilaterally by the Postal Service if within 90 days after the filing of a request for permanent rate increases the Commission has not transmitted its recommended decision to the Governors. Such rates may remain in effect no longer than 30 days after transmittal by the Commission of its recommended decision. Temporary rate increases are limited to the lesser of one third of the preexisting permanent rates or the increases sought in the permanent rate request. Subject to these limitations the Postal Service may set such temporary rates as "it considers appropriate to carry out the provisions of this title." 39 U.S.C. § 3641 (1970).

Jurisdiction in this Court to review the legality of temporary ratesetting is clearly established. *Direct Mail/Marketing Ass'n v. United States Postal Service,* 163 U.S.App.D.C. 157, 501 F.2d 717 (1974); *Direct Mail Advertising Ass'n v. United States Postal Service,* 147 U.S.App.D.C. 394, 458 F.2d 813 (1972).

## II

On September 18, 1975 the Postal Service filed with the Commission a request for a recommended decision on permanent increases in postal rates. Request for Recommended Decision, Docket R76–1, United States Postal Rate Commission (Sep. 18, 1975) [hereinafter cited as *Request*]. 40 Fed.Reg. 44044 (Sep. 24, 1975). Estimating its revenue shortfall at $2.6 billion for fiscal year 1976, the Service requested substantial increases in virtually all classes of mail. In the case of first-class mail the Service proposed that rates be increased from ten cents to thirteen cents for the first ounce, from nine cents to eleven cents for each succeeding ounce, and from seven cents to ten cents for post cards.

Proceedings upon the Service's request before the Commission, in which at least eight of the plaintiff States intervened, are scheduled to extend at least into May of 1976.

On October 9, 1975 the Postal Service announced that on December 28, 1975 it would impose as temporary rates effective December 28, 1975 rates nearly identical to those requested as permanent rates. 40 Fed.Reg. 47589 (1975). In the case of first-class mail, only the temporary rate for post cards, set at nine cents,[1] differed from the requested permanent rates.

## III

In considering this motion for a preliminary injunction the Court must carefully weigh and evaluate four factors: 1) whether the plaintiffs have shown a substantial likelihood of success on the merits of their case; 2) whether plaintiffs have shown that they would be irreparably harmed if the injunction were denied; 3) the extent of inconvenience to the defendant if the injunction were granted; and 4) the public interest in the injunction's grant or denial. *A Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 181, 421 F.2d 1111, 1116 (1969).

In weighing the second, third and fourth factors, all are difficult to weigh and balance. Injury to the plaintiffs if the injunction is denied follows convincingly from the fact that the resulting increases in plaintiffs' first-class postage costs, which increases they allege will exceed $300 million a year, are by statute not refundable even if upon review after permanent ratemaking the increases are found to be illegal. 39 U.S.C. § 3681 (1970). The public injury in denial of the injunction is on the one hand not different in kind from that of plaintiffs, although on the whole greater in degree. On the other hand defendant's operations, wherein also lies the public interest, face injury from its mounting deficits, estimated by defend-

---

1. The rate was set at nine cents apparently in obedience to the requirement of 39 U.S.C. § 3641(c) that the temporary rate increase not exceed one third the prior rate.

ant at $130 million monthly, if the injunction is granted. Plaintiffs suggest that such injury could be mitigated in various ways, including the imposition of equitable temporary rates or the sale of bonds. The former would be of limited effectiveness and the latter of dubious value.

We move then to the first consideration listed above, whether the plaintiffs have shown a substantial likelihood of success on the merits.

## IV

Plaintiffs allege that the temporary rate increases set by the defendant are illegal under 39 U.S.C. § 101(d) (1970), which reads:

> "Postal rates shall be established to apportion the costs of all postal operations to all users of the mail on a fair and equitable basis."

and under 39 U.S.C. § 403(c) (1970) which reads:

> "In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall not, except as specifically authorized in this title, make any *undue or unreasonable* discrimination among users of the mails, nor shall it grant any *undue or unreasonable* preferences to any such users." (Emphasis supplied.)

Section 403(c) has been found to apply to the setting of temporary rates, *Direct Mail/Marketing Ass'n, supra*, 163 U.S. App.D.C. at 158, 501 F.2d at 718, and therefore § 101(d), an even more general statement of rate policy than § 403(c), must also apply.

■ A question arises concerning the application to temporary ratesetting of 39 U.S.C. § 3622(b) (1970), the general statement of rate policy with regard to permanent ratemaking by the Commission, which reads:

> "Upon receiving a request, the Commission shall make a recommended decision on the request for changes in rates or fees in each class of mail or type of service in accordance with the policies of this title and the following factors:     .
>
> (1) the establishment and maintenance of a fair and equitable schedule;
>
> (2) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;
>
> (3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;
>
> (4) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;     .
>
> (5) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;
>
> (6) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;
>
> (7) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services;
>
> (8) such other factors as the Commission deems appropriate."

The structure of the statute and the wording of § 3622(b) leave no doubt that the section has no immediate application to temporary rates. In *Direct Mail Advertising Ass'n, supra*, 147 U.S. App.D.C. at 397–99, 458 F.2d at 816–18, it was held on grounds of statutory construction that the phasing provisions of the Act, 39 U.S.C. §§ 3626–27 (1970), which require the Service to "phase in" rate increases in certain classes, subject to Congress' providing supporting appropriations, had no immediate and

necessary application to temporary rate increases under § 3641. The effect of § 403(c) upon the relation between the phasing provisions and temporary rate-setting was not considered in that case. In *Direct Mail/Marketing, supra,* the Court refused to read *Direct Mail Advertising* "broadly as holding that the phasing provisions have no application to temporary rates," reasoning that, if this were true, the rate structure at issue, in which the Service did not phase one temporary rate because of inadequate congressional appropriations, "would lack the coherent rationale required by the nondiscrimination provision, 39 U.S.C. § 403(c)." *Id.* at 160, 501 F.2d at 720. The Court, therefore, held that once the Postal Service chooses to phase any temporary rates, and seeks supporting congressional appropriations, § 403(c) requires that the phasing provisions become fully applicable. *Id.* at ' 161, 501 F.2d at 721.

Similarly, in the present case, provisions not directly applicable to temporary rates must be used as a guide to the content of § 403(c). Whether strict application of § 3622(b) standards to temporary rates is dulled by some degree of Postal Service discretion in ratesetting under § 3641 [2] need not be decided here, if, allowed the full benefit of review under the standards of § 3622(b), plaintiffs are found not deserving of relief.

In proceeding to examine defendant's rates under the foregoing statutory standards the Court is mindful of the limited scope allowed judicial review of postal ratemaking. In *Association of American Publishers, Inc. v. Governors of United States Postal Service,* 157 U.S.App.D.C. 397, 485 F.2d 768 (1973), a review of permanent ratemaking under 39 U.S.C. § 3628 (1970), a particular allocation of costs to special-rate fourth-class mail was attached as based on an arbitrary and unsupported exercise of "judgment" and as based on a failure to recognize a policy in the Act favoring educational and cultural materials. As to the first point the Court noted that the appraisal of cost figures is a "task for experts," not susceptible of being "proved right or wrong," as to which the Commission's "judgment is entitled to great weight." *Id.* at 402, 485 F.2d at 773, *quoting New York v. United States,* 331 U.S. 284, 328, 67 S.Ct. 1207, 1230–31, 91 L.Ed. 1492 (1947). The "juggling" or rough approximation used by the Commission was upheld by the Court as a result of the inescapable inaccuracies and difficulties of complicated ratemaking. As to the second point the Court refused to condemn the Commission's assessment of the relative importance of factors listed in § 3622(b). The Court stated:

> "A reviewing court under familiar jurisdictional principles may not, and under human limitations generally could not, reassess the weights given by a rate-making agency to different factors, absent a legislative direction as to precisely what gravity each factor bears. All that the court may properly do is to consider whether the agency did take into account all the relevant factors and no others.
>
> \* \* \* \* \* \*
>
> ". . . Ours is only to determine whether the Postal Service lacked substantial evidence for rates it prescribed, took into account irrelevant considerations, omitted relevant considerations, flouted a statutory command, acted *ultra vires,* or denied a Constitutional right." *Id.* at 403–04, 485 F.2d at 774–75.

### V

Plaintiffs attack the new temporary rates variously as "unduly and unreasonably discriminatory," "result[ing] in preferential treatment of certain classes

---

2. In this connection it is worth noting that since commencement of the first rate increase proceeding before the Commission, the periods in which the nation's postal rates have been temporary rates approach in length the periods of permanent rates. The last postal rate proceeding extended for nearly two years.

of mail," "without substantial evidence or sufficient data to support such rates," based on "judgmental biases against first-class mail," "ignor[ing] the statutorily-declared requirement that each class of mail must bear both the direct and indirect costs attributable to that class, as well as such unattributable costs as may reasonably be assigned to such class," and as "inflationary, unwarranted, discriminatory and facially unlawful under the Postal Reorganization Act, 39 U.S.C. §§ 101(d), 403(c) and 3622 (b), and under proper doctrines of ratesetting." Their entire claim is, in essence, an attack on the ratemaking philosophy, methods, data and conclusions used by the Postal Service to allocate the production of postal revenue among various classes of mail.

The issues plaintiffs raise are not new, but were debated at length in the course of Commission ratemaking proceedings in 1971 and 1974. *See especially* Opinion and Recommended Decision, Docket R74–1, United States Postal Rate Commission (August 28, 1975) [hereinafter cited as *Decision*]; Chief Administrative Law Judge's Initial Decision on Postal Rates and Fee Increases, Docket R74–1, United States Postal Rate Commission (May 28, 1975).

These issues also surfaced in an opinion by the Court of Appeals of this Circuit in a direct appeal pursuant to 39 U.S.C. § 3628 from the first ratemaking proceeding. *Association of American Pubishers, supra.* In an unanimous concurring opinion the Court expressed misgivings about the Postal Service's compliance with the ratemaking standards of the Act in its formulation of its request. 157 U.S. App.D.C. at 405–08, 485 F.2d at 776–79. The Court was especially concerned with the Service's response to § 3622(b)(3), quoted p. 555 *supra,* which requires that each class bear its attributable and reasonably assigned costs. This response the Court found "questionable at best," in that the Service had proposed attribu-

tion of only 49 percent of its revenue costs, leaving $5.06 billion of its revenue requirement to be "reasonably assigned" according to an inadequately explained and supported formula. The "fundamental problem" to the Court was an "unstructured and well-nigh unreviewable discretion" reposed in two Postal Service experts to propose allocation of over half the Service's budget. *Id.* at 407, 485 F.2d at 778. Although noting with some approval criticisms of Postal Service ratemaking philosophy, the Court did not adopt them except as illustrations of the "fundamental problem" just noted. Concluding that the Service had been deficient in its efforts to meet standards of diligence that Congress must. have intended, it then added:

"Indeed, Congress may have meant to go further. Its stated intent to purge the postal system of 'politics' provides a strong indication that the Chief Examiner was correct when he suggested that discretionary or 'reasonable' assignment of costs would apply only where Postal Service simply *could not* 'attribute' costs. Under that view, Postal Service could not rectify its errors in this proceeding by merely providing for a more careful 'allocation' of the five billion dollars at stake. It would be required to itemize its costs in more detail, determine which classes of service caused them, and attribute those costs solely on that basis. Only very long-term costs and overhead could be 'reasonably assigned.'

"That question need not be resolved in this case, for the presumptions that surround an initial effort to formulate rates are sufficient to justify the approximations that Postal Service supplied to the Postal Rate Commission here. But, when the Postal Rate Commission establishes guidelines for future rate proposals, it may wish to take a hard look at both the manner in which Postal Service assigns unattributable costs and the amount of

costs that it designates 'unattributable.'" *Id.* at 408, 485 F.2d at 779 (footnotes omitted) (emphasis in original).

The issue raised by the Court in *American Publishers* reappears here. Plaintiffs argue that despite the lapse of more than two years since the decision in that case, the Postal Service now proposes attributing only 55 percent of its total revenue requirement, and judgmentally assigning the remainder, now equalling $6.05 billion. The plaintiffs request that now, at long last, the courts put an end to these excesses and no longer excuse the Service on the ground that the tasks it faces are novel and difficult.

Merged together in the plaintiffs' challenge and, to a lesser extent, in the *American Publishers* concurring opinion, are two independent questions: first, whether the ratemaking philosophy and methods adopted by the Commission in prior ratemaking, which afford justification for the Service's present position, are valid under the Act or other more general principles of ratemaking; and second, if such philosophy and methods are valid, whether they have been applied fairly and diligently by the Service in its current rate proposal. A response to the first question is essential to fair consideration of the second.

The first question is primarily a study of § 3622(b)(3) of the Act, quoted p. 555 *supra,* particularly the terms "attributable" and "reasonably assignable." The Commission interprets "attributable" as designating those costs which can be *shown* to be *causally* related to that class. Whether or not the requisite *showing* can be made in a specific instance depends upon the current advancement and state of the postal cost-accounting art. The Commission sees this art to be in a transitional period, gradually making inroads upon unattributable "institutional" costs toward more complete attribution.

The Commission also feels that *causality* is inherent in the word "at-

tributable." It argues that the only theoretically sound and pragmatic method of allocating costs among classes, and the only one which will adequately guide future ratemaking in avoiding arbitrary and unfair allocations, is a method which determines which costs are actually caused by which class of mail. Other methods of allocation, which it terms "accounting" methods, it finds purely artificial. To attribute on any basis other than causality it feels is to substitute preconceptions and individual judgment as to the proper manner of distribution of costs, which would open the door for inequities among the classes. *See Decision* at 103—09, 118–122.

The definition of attributable costs used by the Service in its present Request is the following:

"1) that portion of the test year accrued costs which will directly or indirectly vary as a result of changes in volume expected to occur in the test year;

"2) accrued costs which been identified as being variable with volume in a longer-run period beyond the test year; and

"3) accrued costs which are not variable with changes in the volume of any class of mail or service but which are incurred as a consequence of providing one, and only one, specific class or type of service."

Direct Testimony of Harold D. Orenstein, attached to *Request,* at 6. *See also Decision* at 94—103, 111—17; Direct Testimony of Stephen F. Sherwin, attached to *Request, supra,* at 4—37.

The Commission believes this interpretation of "attributable" is thoroughly consonant with the statute. There is considerable support in the legislative history for its view. The following passage is from the statement of the House conferees in the Conference Report, H.Rep.No.1363, 91st Cong., 2d Sess. 87 (1970), U.S.Code Cong. & Admin.News 1970, pp. 3649, 3720:

"The provision in the conference substitute with respect to costs at-

tributable to a class of mail or type of service establishes a floor for each class of mail equal to costs which consist of those costs, both direct and indirect, that vary over the short term in response to changes in volume of a particular class or, even though fixed rather than variable, are the consequence of providing the specific service involved. In addition, the conference substitute provides for a judgmental assignment of some part of the remaining costs."

This passage would appear to strongly support the Postal Service position. Similar support for the Service's position is indicated by the rejection of "fully allocated" costing in the following passage from the relevant Senate Report:

"[Private express companies] have expressed their very keen desire to include language in the bill which would require the recovery of fully allocated costs for parcel post. The Committee rejects the suggestion on the principle that no particular cost accounting system is recommended and no particular classification of mail is required to recover a designated portion of its cost beyond its incremental cost. That decision is for the Postal Rate Commission to determine, in accordance with the general criteria enacted by law. . . . To go beyond that point would simply be to recommend provisions of law protecting a particular economic interest . . . . ."

S.Rep.No.912, 91st Cong., 2d Sess. 17 (1970).

To be compared with the Commission's view of the word "attributable" is the view of plaintiffs that § 3622(b)(3) requires that attribution in some form be carried beyond costs found attributable by the Service, using one form or another of allocation, or, in other words, that a much larger portion of total costs be allocated and a much smaller portion spread "reasonably." There is some support in the legislative history for this view:

"[I]f postal rates and postal classifications are going to be established on a basis of charging whatever the traffic will bear to a particular class of mail according to its ability to pay, or what kind of an increase it got last time, or its 'social acceptability,' then Congress is clearly better qualified to make such judgments than the Postal Service or any expert commission. Such purely political judgments are the province of Congress. But if rates and classifications are to be established on the basis of expert considerations of the overall value of the service provided and the allocation of costs on a scientific or quasi-scientific basis, then Congress should be removed entirely from ratemaking and classification business."

S.Rep.No. 912, 91st Cong. 2d Sess. 11 (1970).

█ This passage, however, does not unambiguously support plaintiffs' view of § 3622(b)(3). It does not determine the "scientific or quasi-scientific" methods to be used to allocate costs. The Commission attacks other approaches precisely on the ground that they are not adequately scientific, or correct theoretically. The question arises whether even incorrect allocation is to be preferred to allocation on the basis of reasonable judgment, which, in the case of the Postal Service, is primarily based on value of service, a criterion also mentioned in the passage above. Which of innumerable methods of allocation are to be used when the costs to be allocated are relatively insoluble "institutional" costs? Varying distribution keys can be used, each having widely different effects on the various classes of mail. *See Decision* at 104–06. One fully allocated cost method was used in the Post Office prior to reorganization, from which a shift to causality methods was considered reform. *Decision* at 79–83. In sum, it seems clear to this Court that this is precisely the type of question which Congress intended be left with the Commission.

■ A second question of interpretation is raised by the parties' differing views as to the meaning of "reasonably assignable" in reference to costs found by the Commission to be unattributable. The Commission's concept of the term proceeds from an interpretation of § 3622(b)(2), quoted p. 555 *supra*, which requires value of service to be considered as a factor in ratemaking. To the Commission the concept of value of service is that of demand for the service, or "what the traffic will bear." This interpretation is specifically endorsed in *American Publishers, supra*, 157 U.S. App.D.C. at 404, 485 F.2d at 775, even though this approach was characterized in the passage from the Senate Report last quoted as a political one belonging to Congress. That passage also, however, mentions value of service in the same breath as cost allocation, naming both as permissible criteria for ratemaking.

A summary of the Commission's arguments favoring the demand analysis approach is stated by it as follows:

"With demand analysis . . . we are interested in all of the many factors that influence mail users to make more or less use of postal services. . . . Demand theory is a guide to judgment where judgment only is otherwise available to perform the cost assignment. Like financial analysis, demand theory essentially involves the measurement of market place influences.

"The Law Judge and certain parties, while themselves making use of demand analysis, at times seem persuaded that an allocation of virtually all the institutional expenses in accordance with volume factors, unrelated to demand, is inherently more fair and rational than an allocation premised on demand factors. Precisely the opposite is true under our statute. . . . By taking account of demand factors, we can assign costs in a manner that fully takes into account the noncost factors of the statute, such as the value of the mail service to sender and recipient, the effects of rate increases, and available alternative means of sending and receiving mail matter. Demand factors, properly developed, permit a rational assignment of the institutional costs. An assignment of nonvariable common costs on this basis makes certain that all costs are covered and that the distribution of costs is fair."

*Decision* at 149–50 (footnotes omitted). *See also id.* at 166–68; Direct Testimony of Bernard Sobin, attached to *Request, supra*, at 5–19. Although the Commission's defense is at times overly broad and conclusory, it at least presents a rationale which merits consideration upon judicial review. This Court finds the Commission's approach to be based on a proper interpretation of the statute and to be not an unreasonable solution to the problems of assigning unattributable costs. Under the opinion in *American Publishers* this Court can require no more.

The Commission's approach is also subjected to attack by plaintiffs as operating to the prejudice of first class, since that class is the one for which there is the most unrelenting demand and for which the Service has a statutory monopoly. 39 U.S.C. § 601 (1970). On this point a useful discussion appears in *Payne v. Washington Metropolitan Area Transit Commission*, 134 U.S.App.D.C. 321, 336–37, 415 F.2d 901, 916–17 (1968):

" 'Value of the service' is a concept frequently employed by ratemaking authorities in dealing with the problem of price relationships. Simply stated, the value-of-service approach looks to demand factors, or 'what the traffic will bear,' in apportioning fixed costs among customers or classes of customers. In one sense, employment of a value-of-service approach in ratemaking contexts is anomalous since it sanctions one of the very consequences of monopoly power that public utility regulation was designed to forestall— namely, the ability of the monopolist to maximize his profits by altering

his prices for the same product or service according to the ability or willingness of the particular customer to pay. Nevertheless, value-of-service principles have been widely employed in ratemaking, chiefly on the ground that so long as some contribution to the company's 'overhead' is made by business which, though relatively unprofitable, could not be attracted at a higher price, all farepayers—even those 'discriminated' against—are benefited. The theory is, in other words, that a fare structure which, strictly speaking, is discriminatory may nevertheless result in lower fares to the public as a whole. Two conditions, however, are essential to the validity of this reasoning: (1) the lower-price service must at least provide revenues sufficient to cover its incremental, or direct, costs and in addition make some contribution to joint, or fixed, costs; · and (2) the demand for the lower-price service must be such that if the price were increased its users would discontinue their patronage." (Footnotes omitted.)

■ The above reasoning well restates, and refutes, plaintiffs' objections. Also, the existence of the ratemaking theory described therein lends further support to the Commission's view that the purpose and effect of § 3622(b)(3) is (1) to insure that each class of mail carries the burden of the costs directly or indirectly attributable (in the Commission's sense) to it, plus a reasonable contribution to overhead, i. e., is not impermissibly subsidized; and (2) to include in the process of ratemaking a value-of-service standard which permits the Service to consider those noncost factors which are named in § 3622(b).

In sum, defendant's interpretation and theoretical application of the standards of § 3622(b) is simply not invalid as a matter of law. If the results of defendant's methods, correctly applied, are considered undesirable, redress lies in the Legislature and not the Courts.

All of plaintiffs' objections to defendant's principles of ratemaking thus prove unavailing. Plaintiffs' only remaining challenges to defendant's rates are that defendant has applied these principles incorrectly, arbitrarily, with bias, or with inadequate evidentiary support.

■ First, plaintiffs argue that defendant's attribution of costs has not advanced at a rate which would satisfy the Court in American Publishers, supra. There is no doubt, however, that the Commission and the Service have made significant advances both in theory and in data preparation and analysis. In the Commission's last Recommended Decision it found a number of cost areas where attribution was possible, and it attributed those costs in its ratemaking. See Decision at 136–145. Other groups of costs it felt ought soon to give way to attribution. Examples of the latter are inclusion of long-run variable costs as well as short-run variable costs, Decision at 127–130, 132–35; a shift to proportionate variability as well as 100 percent variability, Decision at 131–32; and attribution among benefited classes of fixed costs which benefit only a limited number of classes, Decision at 168–172. In its present rate request the Service has in fact made substantial advances in the first two of these areas, by its attribution of the long-run variable elements of rental values of postal facilities. See Direct Testimony of Steven F. Sherwin, attached to Request, supra. As to the last of the above three areas, the Commission said in its decision that such attribution "should be explored by the parties in the next case." Decision at 172. The Service in its present request lists, as required by Commission rules, 39 C.F.R. § 3001.54(h)(5), fixed costs which benefit a restricted number of classes. See Request, Attachment G, at 32–36. As to the attribution of such costs the Service says the following:

"The Service suggests that alternative approaches can be explored best in a technical conference with interested parties. Data limitations remain a problem but USPS would

participate in such an approach and consider all reasonable suggestions." *Id.* at 36.

While the pace of the Service's advances may seem to resemble that of the tortoise, the Court may not declare the pace unlawful. On the record before it this Court cannot hold that the Commission in setting the first-class rates failed to follow the law and the state of the art.

■ Plaintiffs also criticize the Service's assignment of nonattributable costs as no more than the arbitrary judgment of one witness, based on inadequate data. This point has been well addressed by both parties. Having examined Witness Sobin's testimony, this Court cannot characterize it as subjective, biased or unsupported, or as any more judgmental than any presentation of an accounting allocation would be. Direct Testimony of Bernard Sobin, attached to *Request, supra.* The process is admittedly one of judgment, here adequately supported, explained, and guided by the criteria set forth in the statute. This Court finds no fault with it.

### IV

For the foregoing reasons this Court finds that plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their case.

It is, therefore, by this Court, this 16th day of December, 1975,

Ordered, That plaintiffs' motion for a preliminary injunction be, and the same hereby is, denied.